**Leo GATSON, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 37714.**

Court of Criminal Appeals of Texas.

Feb. 24, 1965.

Phillip Bordages, S. L. Greenberg, Beaumont, for appellant.

W. C. Lindsey, Dist. Atty., Jim Vollers, Asst. Dist. Atty., Beaumont, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, twenty years.

Appellant challenges the sufficiency of the evidence to support the conviction.

The evidence reveals that the appellant and the deceased had been living together since 1961. After an absence of about ten days the deceased, in good health, returned to appellant's house on Wednesday, August 21, 1963. The appellant and the deceased were seen at home Thursday. The deceased had a bruised eye and cuts on her arms and legs when seen about 10 A.M., Thursday, and the deceased was heard "moaning" that evening.

A neighbor testified as follows: that on Thursday night she heard persons talking at appellant's house, and then heard a woman saying, "What you hitting me for? Are you crazy?" and she next heard persons arguing; that about 7 A.M., Friday morning, she (the neighbor) heard a woman saying "Lord, have mercy. Somebody please help me." She went to appellant's house, knocked on the door, and, after being asked, entered the house, where she found that the deceased "was bruised and cut all over her body as far as I could see, her arms and things, her legs until way up here (indicating). * * * Well, her left eye was all black and it was swelled up until it was closed and her right eye was the same way but it wasn't closed. She had bruises all in her face." An ambulance was called and it

left the house before 8 A.M., taking the deceased to the hospital.

Officer Lawhon testified that after receiving a radio report at 7:45 A.M., he immediately went to the hospital, where he saw the deceased on a stretcher; that she was semi-conscious and had been severely and brutally beaten; that he immediately went to appellant's house, where he found spots of blood on the bed linens and on the floor; that one piece of a broken mop handle was found in the kitchen and the other piece was under the bed in the bedroom, and a one-half inch pipe with blood on it in two places was found on the premises.

A chemist testified that he found bloodstain on the pipe and the mop handle, and that the blood on the linen was of human origin. He further testified that an analysis of the blood specimen from the body of the deceased revealed no alcoholic content.

The physician who performed the autopsy testified that a cerebral concussion and subdural hemorrhage in the head caused the death of the deceased. He expressed the opinion that such injuries could have been caused by the use of a mop handle, but that it was more consistent that they were caused by the use of the iron pipe.

The written statement of the appellant made to Officer Linder, which the appellant signed, was shown to have been voluntarily made and was introduced in evidence without objection. The statement reads in part, as follows:

"On Wednesday August 21, 1963 I got home around 4:30 P.M. from work. When I arrived at the house my wife (Betty Gean) was there. We had been separated for the past 2 weeks and I had talked to her and she returned to the house to live with me. * * * I was talking to Betty about the reason that she left me and why she did not come back to me as she had told me she would at the first time I talked and ask__ her to a couple of days before

she did returned. Betty called me some names and I called her some. I slapped her then. She run into me. I then picked up a stick and I hit her on her legs, arms, and my fist in the face. I hit her on the head with the stick also. * * * The fight was in the bedroom.

"On Thursday August 22, 1963 * * She complained with her head and legs most of the day. * * * The stick that I hit Betty with was a Mop Handle that we had in the house. I broke the mop off the handle. I broke the mop handle into a number of pieces."

The cross-examination of the appellant was, in part, as follows:

"A. Well, I hit her once on the face with it (mop handle) and once or twice on the face with it.

"Q. Well, which way did you swing it?

"A. Well, I swung this a-way once or twice and then I went to hitting her across the body part here.

"Q. You hit her on the body?

"A. Yes, sir.

"Q. How many times did you hit her?

"A. Well, I broke the stick in about two or three places on her.

* * * * * *

"Q Now, when you hit her with it and it broke, when did it break the first lick you hit her with it?

"A. Not the first lick I hit her but about two or three licks after I hit her with it, it broke.

"Q. Well, how many times did you hit her after that?

"A. I couldn't hit her any more, I had done broke it all to pieces.

"Q. Broke it in two or three pieces?

"A. Yes, sir.

"Q. You hit her that hard?

"A. Yes, sir.

"Q. You hit her pretty hard with that mop handle, didn't you?

"A. Yes, sir.

"Q. You were holding it in which hand, your right hand?

"A. My right hand, yes, sir.

"Q. And you say you hit her once on each side of the head?

"A. Yes, sir.

\*  \*  \*  \*  \*  \*

"Q. What did you do with that bar then?

"A. Well, I hit her—I struck her with it about once or twice on the head with it and she fell.

"Q. Hit her once or twice. Whereabouts on the head did you hit her?

"A. Well, I don't remember about where I hit her at but I must have struck her, you know, somewhere about along in here, up aside here (indicating), somewhere on her face.

"Q. You think you might have hit her behind the head?

"A. Might have did. She fell, you see.

"Q. How did she fall?

"A. She fell when I hit her with that thing.

"Q. Hit her up there on the right side of her head?

"A. Yes, sir.

"Q. How many times did you hit her in the head?

"A. I hit her up aside the head with it about twice.

\*  \*  \*  \*  \*  \*

"Q. Did you hit her pretty hard with it?

"A. Well, yes, sir, I am pretty sure I did.

"Q. Hit her pretty hard.

"A. Yes, sir.

"Q. You were pretty mad, weren't you?

"A. Well, yes, sir.

"Q. You got mad at her?

"A. Yes, sir."

Testifying in his own behalf, the appellant stated that the deceased returned to his home after an absence of about ten days; that about 10:30 P.M., the deceased accused him of having other women in the house while she was gone and began cursing him, and when she continued he slapped her and told her to hush. Then the deceased began striking him with a stick, which he took from her, struck her, and then threw it down. Next, she threw a bottle at him, which broke, scattering glass over the bed and floor. She went to the kitchen, soon returned, and began hitting him with a heavy instrument and injured him. Appellant then took the instrument from her, hit her hard in the eye and face, and then struck her several times on the head with the heavy instrument. She fell to the floor, and he put her on the bed. He also testified that he offered to take her to the hospital but she declined; that he cared for her the best he could until he left for work Friday morning; and that he never at any time intended to kill her. Before noon Friday he was informed by the officers that she had died.

The evidence is sufficient to warrant the conclusion that the appellant is guilty, as charged, and supports the conviction.

■ Appellant contends that the trial court erred in refusing to permit him to introduce certain testimony after the state's witness Johnson, on cross-examination, testified as follows:

"Q. Are you receiving any State Welfare?

"A. No sir."

The appellant sought to offer proof that the witness Johnson was then receiving state welfare, but the court refused to admit such proof before the jury.

Appellant insists that the relationship of the witness Johnson with the state, in receiving welfare aid, would cause her to think that such aid would stop unless her testimony was favorable to the state, on the ground that the welfare funds came from the state and this case was being prosecuted in the name of the state by the district attorney.

In Preston v. State, 41 Tex.Cr.R. 300, 53 S.W. 127, this court held: "There was no error in the action of the court refusing to permit the defendant to show by the witness Burke, on cross-examination, that he (Burke) had made out and sworn to a false account against the state as a witness on the trial of the defendant in Atascosa county."

1 Branch 2d 221, Sec. 220, reads as follows:

"When a witness is cross-examined on a matter collateral to the issue, his answer cannot be subsequently contradicted by the party putting the question. The test of whether a fact inquired of on cross-examination is collateral to the issue is this: would the cross-examining party be entitled to prove it as a part of his case tending to establish his plea?"    (Cases cited.)

The refusal of the proffered testimony presents no error.

The judgment is affirmed.

Opinion approved by the Court.